[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION
CT Page 13556 FOR TEMPORARY INJUNCTION DATED JULY 24, 2000
Plaintiff is incarcerated in the Northern Correctional Institution in Somers, Connecticut, a maximum-security prison. He was transferred to that institution because when he entered the Walker Reception Center he was found to have contraband consisting of a stinger which was hidden in his crutch. The stinger has been described by Major Thomas Coates (hereinafter "Coates") who is, among other things, in charge of intelligence at the Northern Correctional Institution (hereinafter "NCI") as an electrical type object which, if used, could damage the electrical system in the prison. Further, the plaintiff Michael Scatena (hereinafter "Scatena" or the "plaintiff') has received 291 disciplinary tickets while in the Connecticut prison system. Mr. Scatena has brought this injunction action requesting that the court order the defendants (additional defendants are the Warden of Northern Correctional Institution and other officials of said prison) to provide Scatena with non-rabbinical food and liquid staples that are free of the Jewish religious kosher food symbols known as "©" and "k" and to provide to Scatena a raw fruitarian diet (in the form of a vegetarian diet) as prescribed by the World Church of the Creator (WCC). In support of his motion for temporary injunction the plaintiff states that he is not Jewish nor does he wish to participate in any Jewish religious customs such as being forced to consume food and liquid staples described in various exhibits. "along with the common fare or regular diet the Department of Corrections (DOC) serves because they violate his religious beliefs as a member of the WCC and as a former Mormon." This case came before the Court for a hearing on October 26, 2000 at which the plaintiff appeared and was heard as a pro se, and the defendants prison officials appeared and were heard represented by Assistant Attorney General Henri Alexandre.
The Court heard testimony from Mr. Scatena, Robert Deveau (hereinafter "Deveau"), Director of Food Services for the Department of Corrections, Reverend Anthony J. Bruno (hereinafter "Bruno"), Director of Religion at NCI and Major Thomas Coates whose position is aforementioned.
As a preliminary matter the Court notes that it refused to issue subpoenas for witnesses requested by the plaintiff, being other prisoners of the defendants, namely Carnell Hunnicut, Eric Atkinson and Francis Anderson. The Court refused to issue subpoenas for said witnesses partly based upon the objection by the Attorney General on the grounds that their production would create a serious safety and security problem at NCI. They are incarcerated there because of their chronic disciplinary history and potential violence. If, at some future proceeding, it is necessary to have these men as witnesses, the Court will have them appear CT Page 13557 by teleconferencing. However, the Court finds that their presence is unnecessary because the Court will concede that these witnesses, all of whom are African American, will testify that the plaintiff's religion is not a threat to them. However, the Court finds such testimony irrelevant because it does not address the issues of the motion for temporary injunction. The Court has already ruled in the case of John Barletta v.Warden Larry Meyers that said Warden of NCI is not required to provide prisoners with the White Man's Bible and other white supremacist documents on the basis of the testimony in that case from prison officials that such documents would be inflammatory and endanger the security of other inmates and the prison. The Court found this to be a legitimate penological interest which takes precedence over the claimed constitutional violation of the inmates' religious rights. Further, this motion for temporary injunction does not concern itself with the delivery of this literature.
As a further preliminary matter it is well-settled law in Connecticut that a plaintiff is entitled to a preliminary or temporary injunction only if such plaintiff proves a reasonable likelihood of success on the merits and irreparable harm to him if the injunction is not issued.Griffin Hospital v. Commission on Hospitals, 196 Conn. 451, 458 (1985);Branch v. Occhionero, 239 Conn. 199, 207 (1996).
 ISSUES
The Court will now discuss the following issues relevant to this Motion:
1. Whether the World Church of the Creator ("WCC") is a religion. Father Bruno testified that he had been unable to find after a thorough search any documents that would indicate conclusively that WCC is a religion. Further, he could not find that it is listed with the Internal Revenue Service as an eleemosynary/charitable institution under the exemptions provided in IRS Section 501(c). Introduced as an exhibit was an affidavit from "Reverend" Matthew Hale, the leader of the WCC, that WCC had been approved under IRS Section 501(c). However, the Court finds that there is no specific definition of a religion that would exclude the WCC. The Court is well aware of the major religions, Protestantism, Catholicism, Judaism, Muslim, Buddhism, etc. The Court is also aware that an individual can simply declare himself or herself as a minister and choose a title for his/her religion and solicit members. Under our laws, there is no prohibition against such a creation or calling itself a religion. The Court, therefore, for the purposes of this motion is willing to accept the WCC as a "religion" no matter how racist and abhorrent the principles of said religion may be. Further, the Court is also willing to accept that being required to eat foods approved for Kosher could be a violation of such religion because it does state on CT Page 13558 page 401 of the White Man's Bible:
 "3. As the White Race becomes united, informed and aroused we will boycott every Jew and every aspect of Jewish influence in our society."
The Court has admitted plaintiff's exhibits as follows:
1. Labels of condiments served to all prisoners which include ketchup, mustard, mayonnaise and SIGM 4 which is claimed to be pancake syrup, all of which have the religious symbol with the "u" in a circle which designates that the condiments are approved for kosher.
2. Guida's orange drink with the same symbol.
 3. Crispy Rice Cereal with the symbol "K" which allegedly is indicative of approval for kosher.
4. Cornflakes with a "K".
5. Guida's orange juice with one of these symbols.
6. Guida's milk with one of these symbols.
7. Wachusett potato chips with one of these symbols.
17. Guida's chocolate milk which does not appear to have such a symbol.
The Court pointed out to Mr. Scatena that water, fruits, and vegetables are all approved for kosher although they are not so labeled. The Court became aware of this from its own research and takes judicial notice of same. The Court then asked the plaintiff if he were anti-Italian, would he then refuse to eat pasta. He answered in the affirmative. The plaintiff appears to object to those items with the aforementioned labels on them but considers water, fruits, vegetables, etc. not to be approved for kosher because there is no label on them, and he is perfectly willing to drink water and eat fruits and vegetables. Plaintiff's Exhibit 14 is a reprint of definitions from Webster's Ninth New Collegiate Dictionary which defines kosher as "sanctioned by Jewish law; esp.: ritually fit for use: selling or serving food ritually fit according to Jewish law." Plaintiff claims that these food items were, therefore, "blessed". The Court finds that it does not mean that these foods are necessarily "blessed".
The Court concludes on this issue that even though the plaintiff will eat foods the Court has described to him as having being approved for CT Page 13559 kosher, namely water, fruits, and vegetables, he still maintains that what is kosher are only those foods with the aforementioned labels on them. This is simplistic reasoning and has no merit. However, as for the food items that have the aforementioned labels which are approved for kosher, the Court does find that to require the plaintiff to eat such foods with the aforementioned labels is a violation of his religious principles. The remedy for the plaintiff is simply "Don't eat or drinksuch foods."
It should be noted that whether the plaintiff adheres to these principles because of the religious rights he claims under the WCC is open to question. Plaintiff stated that he was a vegetarian from 1995 until March 2000 because during that period he was a member of the Mormon faith. According to defendants' Exhibit D of Religious Beliefs and Practices of the Church of Jesus Christ of Latter-Day Saints (Mormon) a vegetarian diet is not required. The handbook states in pertinent part" . . . Latter-Day Saints eat meat sparingly, encourage the use of wholesome herbs, fruits and grains and totally abstain from the use of tea, coffee, tobacco, alcohol and drugs." This is further described in the same terms in defendants' Exhibit E which is a description of the Mormon Church from the Handbook for Army Chaplains. Thus, he adopted a vegetarian diet even though it was not mandated by the Mormon religion.
 IRREPARABLE HARM
Mr. Deveau, Director of Food Services of the DOC, testified that the common fare diet is meatless but does provide 2700 to 2800 calories per day which clearly meets the recommended daily allowance for nutritional purposes. The common fare diet has been described by Father Bruno (Plaintiff's Exhibit 21) as meeting all nutritional needs without the presence of food items forbidden by religious dogma. However, pursuant to Plaintiff's Exhibit 9 which is the affidavit from the leader of the WCC the plaintiff is limited in his diet. Said affidavit states in pertinent part:
 "4. That in order to fully practice our Faith adherents must practice a fruitarian diet; namely adherents must only consume raw fruits, vegetables, nuts, and seeds in their natural, unprocessed state."
Mr. Deveau stated that following the common fare diet but eliminating such items as fish, meat and other items, if the plaintiff added peanut butter and jelly to his meals, he would be able to maintain a proper level of nutrition in his consumption of food. He stated that peanut butter and jelly could be substituted for milk, eggs and fish. He further stated that DOC does not offer a vegetarian diet. He stated that he could CT Page 13560 provide peanut butter and jelly as part of the diet which would be sufficient but in order to do so he would need approval from the Commissioner of Corrections. He indicated that this could create a problem in distribution if more inmates were to request same. This may not be a problem because according to Father Bruno he knows of only two members of the WCC in the prison system, namely John Barletta and the plaintiff.
Defendants' Exhibit A shows purchases by the plaintiff from the prison commissary of peanut butter and grape jelly as well as a lemon drink and candy on September 12, 2000, peanut butter and jelly on September 19, 2000, September 25, 2000, and on October 2, 2000, peanut butter, jelly, fruit punch, candy, hot sauce, saltines, honey buns and chocolate chip cookies. On October 10, 2000 he purchased peanut butter and on October 16, 2000 he purchased peanut butter, saltines and chocolate chip cookies. Therefore, the addition of peanut butter and jelly which both Scatena and Deveau stated would be sufficient for Scatena's diet even if he were to discard items that did not fit in with his religious principles would meet his daily nutritional requirements. From this exhibit it is clear that he has peanut butter and jelly available to him from the commissary. The plaintiff claims that there are times when because of disciplinary reasons he is prohibited from using the commissary.[1] of course, he is the individual who is responsible for his own disciplinary problems, and he should not present disciplinary problems if he wants to obtain the peanut butter and jelly from the commissary. The plaintiff is expected to be released from prison on June 6, 2001, and it would appear to this Court that he should be able to avoid the loss of commissary privileges between now and then.
Accordingly, by being able to supplement his diet with peanut butter and jelly which is readily available to him, he will be able to adhere to his "religious" principles and still maintain a sufficiently nutritional diet.
For that reason, the plaintiff has failed to show that he will suffer irreparable harm under the circumstances. The motion for temporary injunction is denied.
Rittenband, JTR